1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA           .      Docket No. CR 96-0319
                                   .
            vs.                    .      Washington, D. C.
                                   .      September 27, 1996
(#01)  LOUIS A. WILSON,            .      11:30 a.m.
(#02)  RALPH T. WILSON,            .
                                   .
            Defendants             .
                                   .
. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF ARRAIGNMENT
BEFORE THE HONORABLE NORMA HOLLOWAY JOHNSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:           ROBERT MUELLER, AUSA
                              U. S. Attorney's Office
                              555 4th Street, N.W.
                              Washington, D. C. 20001

For Defendant L. Wilson:      LEONARD BIRDSONG, ESQUIRE
                              1250 Eye Street, N.W., Suite 801
                              Washington, D. C. 20005

For Defendant R. Wilson:      DAVID HOWARD, ESQUIRE
                              Federal Public Defender Service
                              625 Indiana Avenue, N.W.
                              Washington, D. C. 20004

ALSO PRESENT:

For Defendant #03,
Marcellus Judd:               RICHARD SELIGMAN, ESQUIRE
                              601 Indiana Avenue, N.W., Suite 910
                              washington, D. C. 20004

Official Court Reporter:      GORDON A. SLODYSKO
                              4806-A U. S. Courthouse
                              Washington, D. C. 20001
                              (202) 273-0404

Computer-Aided Transcription of Stenographic Notes

2

<u>P R O C E E D I N G S</u>

(Defendants present)

THE COURT:  Good morning.

COUNSEL:  Good morning, Your Honor.

THE DEPUTY CLERK:  Criminal Case No. 96-319, United States of America versus Louis A. Wilson and Ralph T. Wilson. For the Government, Robert Mueller; for Louis A. Wilson, Leonard Birdsong; for Ralph T. Wilson, David Howard.  The Defendants are present in the courtroom.

THE COURT:  All right.  Mr. Louis A. Wilson?

DEFENDANT L. WILSON:  Yes, ma'am.

THE COURT:  Would you come forward, please?  You are Mr. Louis A. Wilson?

DEFENDANT L. WILSON:  Yes, I am.

THE COURT:  All right.  Mr. Wilson, you are here today with your attorney, Mr. Birdsong, all right?

Mr. Ralph T. Wilson, if you'll come forward, Mr. Wilson.  Now, if you'll just stand here next to Mr. Birdsong, I'd appreciate it.  You are Mr. Ralph T. Wilson?

DEFENDANT R. WILSON:  Yes.

THE COURT:  All right.  Mr. Wilson, you are here today with your attorney, Mr. Howard.  I'd like you to know that you are before the Court today because a grand jury returned an indictment against each of you on September 19, 1996.  It is an indictment in seven counts.  The first count of the indictment

3

charges you with conspiracy, in violation of 18 U. S. Code, Section 371; the second count charges you with killing a witness; the third count charges you with using a firearm during and in relation to a crime of violence; the fourth count charges you with retaliating against a witness; the fifth count charges you with using a firearm during and in relation to a crime of violence; the sixth count charges you with first degree murder while armed, premeditated; and the seventh count charges you with possession of a firearm during a crime of violence or dangerous offense.

At this time, I'm going to present to each of you and to your counsel a copy of this indictment. Now, we're not going to read the indictment at this time, but I'd like to advise you, if I may, of your rights at this time.

Each of you has the right to have an attorney represent you. That is why Mr. Birdsong has been appointed to represent you, Mr. Louis Wilson, and why Mr. Howard and Ms. Pendry have been appointed to represent you, Mr. Ralph Wilson. I'm sure you have heard that Ms. Pendry has been a little under the weather.

DEFENDANT R. WILSON: Yes.

THE COURT: But she is still appointed to represent you and will be a part of your team. All right?

DEFENDANT R. WILSON: Yes.

THE COURT: Now, in addition to having the right to have an attorney represent you, I'd like you both to know that

4

you have the right to have a trial by jury on each and every count of this indictment.  In addition to having the right to a trial by jury, you have a right to remain silent.  And by that, I mean you are not required to say anything to anybody about this offense; and anything that you do say to anyone other than your attorney may and perhaps will be used against you.

And you also have a right to be fully informed of the nature of the charges against you.  I have just advised you that each of you is charged in a seven-count indictment.  In Count One, the conspiracy, Mr. Louis Wilson, Mr. Ralph Wilson, and a Marcellus Judd are charged.  In the second count, charging killing a witness, Mr. Louis Wilson, Mr. Ralph Wilson, and Mr. Marcellus Judd are charged.  In Count Three, using a firearm during and in relation to a crime of violence, only Mr. Louis Wilson is charged.  In Count Four, retaliating against a witness, both Mr. Louis Wilson, Mr. Ralph Wilson, and Mr. Marcellus Judd are charged.  In Count Five, using a firearm during and in relation to a crime of violence, only Mr. Louis Wilson is charged.  In first degree murder while armed, premeditated, Mr. Louis Wilson, Mr. Ralph Wilson, and Mr. Marcellus Judd are charged.  And in Count Seven, possession of a firearm during a crime of violence or dangerous offense, only Mr. Louis Wilson is charged.

Now, counsel -- you, as I said, have a right to be fully informed of the nature of the charges against you, and I

5

would ask you, Mr. Birdsong, before I ask Mr. Louis Wilson how he answers these charges, whether you would like for me to read the indictment to him.

MR. BIRDSONG:  Your Honor, having heard everything you've said, we would waive any further reading of the indictment.

THE COURT:  All right.  And how does he answer the charges in the counts to which he is charged?

MR. BIRDSONG:  To the counts in which he is charged, Your Honor, he pleads not guilty.

THE COURT:  Thank you very much.

Mr. Louis Wilson, I will enter pleas of not guilty for you as to each and every count of the indictment in which you are charged.  All right?

Now, Mr. Howard, I turn to Mr. Ralph Wilson and I ask you, do you wish me to read the indictment to him?

MR. HOWARD:  No, Your Honor.  We will waive formal reading at this time and enter pleas of not guilty as to each count with which he is charged.

THE COURT:  Very well.  Then, Mr. Wilson, I will enter pleas of not guilty for you as to each and every count of this indictment in which you are charged; all right?

DEFENDANT R. WILSON:  All right.

THE COURT:  Now, you have received copies of the indictment.  Mr. Birdsong and Mr. Howard and Ms. Pendry will get

6

very active now in getting discovery from the United States. And what is important to me is that we meet again within the next two or three weeks to determine what the status of the case is. And both, or all of your attorneys will be in a better position to determine what is going on after they receive discovery from the United States.

Let me just ask you, Mr. Mueller, how soon do you think you'll be able to get discovery to counsel?

MR. MUELLER: By the end of next week, Your Honor.

THE COURT: By the end of next week?

MR. MUELLER: Yes, Your Honor.

THE COURT: Okay. They believe they can get their discovery to you by the end of next week, and I'm sure you will be learning many other things in the meantime. So, let's see if we can have a status hearing --

MR. HOWARD: Your Honor.

THE COURT: Yes, sir.

MR. HOWARD: May I bring something to the Court's attention.

THE COURT: Yes, sir.

MR. HOWARD: Mr. Judd's attorney is in the back of the courtroom. And I happened to be present to arraign Mr. Judd when he got brought in in front of Magistrate Attridge.

THE COURT: Yes. And, unfortunately, I don't know why the magistrate was given a date in November, but that clearly is

out of the question.

MR. HOWARD:  Okay.  I just wanted to bring that to the Court's attention.

THE COURT:  How are you, Mr. Seligman?

MR. SELIGMAN:  Good morning, Your Honor.

THE COURT:  That's clearly out of the question.  That's much too far from now.  So, let's see if we can find a date that is agreeable with everybody who is here present.

MR. HOWARD:  Ms. Pendry is, of course, going to be the lead counsel as to Mr. Ralph Wilson.

THE COURT:  Yes.

MR. HOWARD:  And had asked that the Court set a date that's no earlier than three weeks from today.

THE COURT:  Well, let me just say, I would like very much for her to be present.  Now, based upon what Mr. Mueller has told me, he believes he can have discovery to you by -- what would that be?  October 4?

MR. MUELLER:  If you could give me to the 7th, Your Honor, just over the weekend.

THE COURT:  All right.  He says he could have all discovery to you by October 7.  That's about ten days from now.  Let's look in the week of the 21st of October.  Right now, about the only date that I truly have available at 9:45 in the morning is the 24th.  But on the other hand, if you would like me to, I could schedule this case in the afternoon at 4:00,

8

4:30.  But I prefer to do my status hearings either before I get started on the jury trials or at the end of the day when I've about finished.  So I have the 24th available.  I have Friday, the 25th, too, but only at 4:30, and I never like to come in Friday at 4:30.  I will do it.

MR. SELIGMAN:  The 24th is available for me, Your Honor.

MR. BIRDSONG:  It's available for us also.

THE COURT:  The 24th is?

MR. BIRDSONG:  Yes.  All day, Your Honor.

MR. HOWARD:  Yes, your Honor.

THE COURT:  And the morning hour is good for everybody?

MR. BIRDSONG:  That's fine.

MR. HOWARD:  That's fine, Your Honor.

MR. SELIGMAN:  That's fine.

THE COURT:  Mr. Mueller, is that all right with you?

MR. MUELLER:  That's fine with me, Your Honor.

THE COURT:  Okay.  Thursday, the 24th of October, at 9:45 in the morning.  I'll ask you to all be here and we will see just what is what.

MR. SELIGMAN:  Your Honor.

THE COURT:  Yes.

MR. SELIGMAN:  Will it be your practice for us to file motions after the status?

9

THE COURT:  Oh, no.  You file your motions as soon as --

MR. SELIGMAN:  File as soon as possible.

THE COURT:  You file your motions as soon as you possibly can.  And what I will give to Mr. Birdsong, who I don't remember ever meeting before, and the other two, who are quite familiar with my little status form -- there are certain general things I like to know, and I'm going to give each of you a copy of that form.  You don't have to use the form.  You may just use the contents of the form and provide the information to me any way you wish.

MR. SELIGMAN:  As a scheduling matter.

THE COURT:  Yes.

MR. SELIGMAN:  I was just alerted to it, and maybe Mr. Howard knows this better than I.  I think Ms. Pendry had what may be a related case before Judge Sporkin?

THE COURT:  I don't know.

MR. SELIGMAN:  I thought it was our obligation to tell the Court.

MR. HOWARD:  She does have a case.  As to whether or not it's related, I think we need to investigate that.  I can only opine.  All indications at this time are that they are related and that there are some common --

THE COURT:  Let me just say this.  Normally, if there is a related case, the U. S. Attorney's Office would know about

10

it and normally tell the Court.  Do you know anything about it?

MR. MUELLER:  Mr. Ralph Wilson is charged with an offense relating to the possession of narcotics and weapons found in his house.  And we did --

THE COURT:  That is before Judge Sporkin?

MR. MUELLER:  That is before Judge Sporkin.

THE COURT:  Oh, but it doesn't have anything to do with this case.

MR. MUELLER:  It does not have anything to do with the incident related to this case.  That is correct.  Now, the argument can be made that there was a search and that some of the things from the search could be used in this case, but it's a completely different -- well, the search was related to this case.  Let me put it that way.  The search in which items were found for which Mr. Ralph Wilson is now being prosecuted before Judge Sporkin, one of the affidavits for the search warrant related to this case.  That is correct.

THE COURT:  Well, I don't know if this three co-defendant case, because of Mr. Ralph Wilson, means that it has to be transferred to Judge Sporkin.

MR. SELIGMAN:  I don't know whether it does either.

THE COURT:  Or one or the other.  If you think so, it's all right with me because, you know, I'll do one or the other.  It doesn't matter to me, whatever.

MR. SELIGMAN:  I just thought the Court should be

11

alerted to it.

THE COURT:  But I don't think it's related in the sense that it should be transferred to him.  I really don't think so.

MR. SELIGMAN:  I don't know enough about the case yet, Your Honor.

THE COURT:  I don't know anything about this case.  All I know is what the indictment reads.  That's all I have been able to read.  And based upon what Mr. Mueller tells me, it does not appear that they are so related.  But you can look into it, if you wish.  But at any rate, right now, everybody prepare for the status hearing on the 24th.  All right?  There's no question but that you should do that.  And nobody will hurt my feelings if you want to transfer it to Judge Sporkin, okay?  My feelings will not be hurt.  Okay?

MR. HOWARD:  Thank you, Your Honor.

MR. SELIGMAN:  Very well, Your Honor.

THE COURT:  Now, I'm sure you have taken care of Mr. Judd.

MR. SELIGMAN:  Yes.  He was arraigned previously, and he just had a detention hearing this morning before Magistrate Judge --

THE COURT:  Magistrate Judge Attridge.

MR. SELIGMAN:  That's correct.

THE COURT:  Okay.  Why don't we give Mr. Seligman a copy of this form now, and if he's ready to go, he's free to --

12

you're free to go.  You are certainly welcome to stay if you like, but I just wanted to do this, because I do have to discuss bond with respect to the other two defendants.

MR. SELIGMAN:  I'll step back, Your Honor.

THE COURT:  I do not have a Pretrial Services report on either.  If you would like, I can arrange to have that done and then we can come back this afternoon and handle that.  Or, let me ask you, Mr. Howard, how does your client stand with respect to Judge Sporkin's case?

MR. HOWARD:  That's what I was just trying to determine, Your Honor.

THE COURT:  Okay.

MR. HOWARD:  Apparently, at least Mr. Ralph Wilson's current understanding of the situation is that Judge Sporkin held the question of bond under advisement until the suppression is litigated, which I'm not -- that's what his current understanding is.  I would like the opportunity to check it out.

THE COURT:  Apparently he must be held without bond.

MR. HOWARD:  Yes, your Honor.  I would like the opportunity to check it out.  But I know he's in custody in front of Judge Sporkin.  For whatever the reason, whatever the status, I'll bring it to the Court's attention.

THE COURT:  All right.  Well, as I said, unfortunately, they did not get -- Pretrial Services did not get an opportunity

13

to see them before they came here. I can refer them now, or if you think you know enough about them to proceed without that information --

MR. BIRDSONG: Well, Your Honor.

THE COURT: Yes, Mr. Birdsong.

MR. BIRDSONG: I feel it's always safe to have a pretrial interview. But even before we take up this question of bond, I would like to bring to the Court's attention that my client, Mr. Louis Wilson, has been represented in this case by attorney Gary Sidell, and he is charged already in Superior Court with what I understand are the basics of this same case. Mr. Wilson asked me to indicate to the Court that he would like to have Mr. Sidell to stay in it as a matter of economy; he knows the case. I was asked to become involved yesterday. I'm certainly willing to take the appointment and do what I could. However, I'm willing to defer to Mr. Sidell, who I've known for almost 20 years and put a lot of faith in.

THE COURT: Well, let me just say this. Mr. Sidell is not a member of the C.J.A. Panel in this Court. And although I received telephone calls from Mr. Sidell yesterday asking me, because I don't know Mr. Sidell and because I know how very serious this case is, I asked that a member of the bar of this Court's C.J.A. Panel be appointed. And that is why you were so appointed.

I'm certainly not in any position to say that

14

Mr. Sidell is not a fine person. I simply say that Mr. Sidell has not been qualified to serve on the C.J.A. Panel in this court. And I did not and do not have the time to go out and have him investigated and determine that. And that is why you have been appointed. He may well be a part of the C.J.A. Panel at the Superior Court. Even that, I don't know. So that is why, Mr. Birdsong, I am sure, you were appointed, because I asked that we appoint someone from this Court. I don't know him.

MR. BIRDSONG: Very well, Your Honor. I understand. I've had some experience in these cases and, like I said, I'm happy to have the appointment and I will certainly represent Mr. Wilson. I am bringing his wishes to the Court, and there is a ruling on that.

THE COURT: Yes.

MR. BIRDSONG: Now, with respect to bond, obviously, I do know something about my client. However, I think it's probably safest to have Pretrial Services interview him. I would like to see something -- if I had had the time, I would have liked to have put something in writing, but I think that if we have to come back, my client is not opposed to coming back at a later time. But I know this needs to be taken care of fairly expeditiously.

THE COURT: Yes. Well, let me just say this. The reason I would like to do it today is that I will not be

15

available to do it next week.  It would have to be the week after.

MR. BIRDSONG:  Right.

THE COURT:  So I would prefer to do it today.  And I think that if I ask Pretrial Services to get involved now, we could have it done this afternoon, if you and Mr. Howard are available this afternoon.

MR. HOWARD:  Your Honor, I have a 2 o'clock sentencing before Judge Sullivan.  Otherwise, I would be available. Actually, I'm not certain, because there were two matters that I had before Judge Attridge that had to be handled in my absence. I'm not certain whether or not he moved them over to 1:45.

THE COURT:  I could be ready at 3:30.

MR. HOWARD:  3:30 would be fine.

THE COURT:  Let me ask you, Mr. Mueller, is that available for you?

MR. MUELLER:  That's available, Your Honor.

THE COURT:  All right.  Would 3:30 be available for you?

MR. BIRDSONG:  I can certainly be back here at 3:30, Your Honor.

THE COURT:  Well, let me just say this.  If you want me to, I could handle Mr. Howard at 3:30.  You say your sentencing is at 2:00?

MR. HOWARD:  At 2:00.

16

THE COURT: You should certainly be ready at 3:30.

MR. HOWARD: Hopefully. I had a two-hour sentencing this morning, which I thought was going to be the shorter of the two.

THE COURT: Well, maybe if you'd just not talk so much. I'm teasing you, of course.

Do him at 3:30, and you when you get here. I should be ready by 3:45, 4 o'clock.

MR. HOWARD: Your Honor, before we address that matter, I understand that when there is an indictment, the Government can proceed by a proffer, but I assume that's a matter within the discretion of the Court. And we figure that in view of these circumstances, that an analysis of the strength of the Government's case, since it's not spelled out, might be appropriate. And if we're going to have a witness, then maybe we should do it at the same time.

THE COURT: Oh, fine. At 3:30?

MR. MUELLER: 3:30. My intention, I'll be clear to the Court, is to proceed by way of proffer, which is permitted under the rules.

THE COURT: All right.

MR. BIRDSONG: But we still think that together would be fine. I have no problem with that.

THE COURT: Oh, sure. That's fine. I was just trying to accommodate you.

17

MR. BIRDSONG: Yes. I had had some things set, Your Honor. I could well be back by 3:30.

THE COURT: You can?

MR. BIRDSONG: I certainly can, yes.

THE COURT: Okay. Fine. 3:30 will be fine.

MR. BIRDSONG: If you had said 2:00, it would have been difficult. But 3:30 is fine.

THE COURT: All right. As I said, I have a matter at 3:00, but I don't know why I can't be ready by 3:30. All right?

MR. HOWARD: Your Honor, should we litigate the issue of the witness, or is a witness going to be present in case the Court wants --

THE COURT: He says he's going to do it by proffer.

MR. HOWARD: I know that's his intention. We think that --

THE COURT: Well, let me just say this. I won't know until I hear his proffer whether that will be adequate. Okay?

MR. HOWARD: Certainly.

THE COURT: If you want to discuss it with him, you may. You are welcome to. All right?

MR. HOWARD: Certainly. Maybe a witness would be appropriate, though, and the Court should decide in our favor.

THE COURT: Mr. Howard, as I said, he says he's going to do it by proffer. You can talk to him if you wish. If you

18

want a witness, then you may be able to bring one.  I don't know.  You talk to him.

MR. HOWARD:  Thank you, Your Honor.

THE COURT:  Mr. Ralph Wilson, you'll be coming back before me at 3:30 for me to determine what your status shall be pending the trial in this case.  All right?

DEFENDANT R. WILSON:  Yes, Your Honor.

THE COURT:  And you may step back with the Marshal now.

And, Mr. Louis Wilson, you will be coming back to me at 3:30 for us to determine your status pending trial.  All right? And you may step back with the Marshal now.

(Defendants taken from the courtroom)

THE COURT:  Mr. Sidell, would you approach the bench, please, with Mr. Birdsong?

MR. SIDELL:  Certainly, Your Honor.

(Bench conference on the record)

THE COURT:  Mr. Sidell, I received your telephone messages to me requesting that you be appointed in this case, and I asked my secretary to call you to tell you that I have made the decision to appoint someone from our C.J.A. Panel.  Is there some reason why you came over here today?

MR. SIDELL:  I did because I spoke most recently last evening with Mr. Wilson, and it was then and remains now his desire that I continue to represent him.

19

THE COURT: Well, let me just say this. I don't deny that for one moment. I don't deny that for one moment, Mr. Sidell, that it may indeed be his desire to have you. But I tried very hard to let you know that since the judgment was mine to make, I have made the judgment to use our own Federal Defender Service and those persons on our C.J.A. Panel or whoever Mr. Kramer thought was best. I don't know whether Mr. Kramer knows you or not. I know I don't know you. Although Mr. Birdsong has said he's known you for 20 years, I don't think I've ever seen you before in life. And I think that your very presence creates a type of circumstance that I don't think is proper. So I wish that you would not do this to me again. All right?

MR. SIDELL: I certainly did not intend any inappropriate --

THE COURT: It was inappropriate for you to come, and certainly inappropriate for you to be in the well of this court when I had advised you that I had made a decision not to utilize your services. All right?

Thank you.

(End of bench conference)

THE COURT: Excuse me, sir. You have no business going back there. You have no reason to be in the well of the court, and I ask you to leave now. I have never seen such disrespect. I have never seen such disrespect.

20

(Recessed at 12:03 p.m. until 3:35 p.m.)

(Defendants present)

THE COURT:  Good afternoon, counsel.  We'll call the case at this time.

THE DEPUTY CLERK:  Criminal Case No. 96-319, United States of America versus Louis A. Wilson and Ralph T. Wilson. For the Government, Robert Mueller; for Louis A. Wilson, Leonard Birdsong; for Ralph T. Wilson, David Howard.  The Defendants are present in the courtroom.

THE COURT:  All right.  Mr. Birdsong, if you and Mr. Wilson would come forward.

MR. BIRDSONG:  Very well, Your Honor.

THE COURT:  Have you received a copy of the Pretrial Services report?

MR. BIRDSONG:  Yes, Your Honor, we have.

THE COURT:  Okay.

MR. BIRDSONG:  I've had a chance to briefly review it with my client.  Some of the information we had gone over before that report, so I've had a chance to verify it with him.

THE COURT:  All right.  You want to make your proffer first?

MR. MUELLER:  I do.  I haven't had a chance to see the Pretrial Services report, if I could.

THE COURT:  You have not had a chance to see the report?  Okay.  Let me pass you your copy.  You have your copy.

21

MR. BIRDSONG:  I do, Your Honor.

THE COURT:  And, Mr. Howard, you have your copy.

MR. HOWARD:  Yes, Your Honor.  I do.  Thank you.

THE COURT:  Well, I guess this is your copy of both, or the second one.  Why don't we be seated while he has an opportunity to look at it.

MR. BIRDSONG:  Very well.

THE COURT:  Did you get yours from someplace other than from me?

MR. BIRDSONG:  Your Honor, I stopped by Mr. Rybicki's office.  I went directly to Pretrial.  He had told me there was one up here, but he gave me another one.

THE COURT:  All right.  Fine.  Thank you.  Because I was wondering where I got this extra one from, then.  But I can certainly use it.

MR. MUELLER:  Your Honor, I'm ready to proceed by proffer.

THE COURT:  By proffer?  We're ready to hear from you.

MR. HOWARD:  Your Honor, so that we don't waste any time focusing on Mr. Ralph Wilson, at this time we have received a copy of an opinion and detention order by Judge Sporkin.

THE COURT:  You have received what?

MR. HOWARD:  A detention order from Judge Sporkin in his case.

THE COURT:  All right.

22

MR. HOWARD:  And there was mention, I think -- that's why there was confusion.  I think the very last sentence of the order says, "However, Defendant may renew his motion when the factual record has been further developed following the suppression hearing."  So there was that matter in front of Judge Sporkin.  We do not at this time contest detention and reserve our right to raise it at any later stage where it might become appropriate.

THE COURT:  Well, why don't you go on and listen to the proffer today so that, if the case is mine, I don't have to hear it again.  Okay?

MR. HOWARD:  Okay.

THE COURT:  All right.

MR. HOWARD:  Thank you, Your Honor.

THE COURT:  Certainly.

MR. MUELLER:  Then that answers my first question, which was whether I should go forward on both Defendants or just one.

THE COURT:  I would prefer your going forward on both.

MR. MUELLER:  Then I will go forward on both, Your Honor.  Let me first, if I could, hand to the Court a chronology that I have typed out.  I have given counsel a copy.  It might be easier for the Court to follow.

THE COURT:  Certainly.  Thank you.

MR. MUELLER:  Counsel has a copy of this.  And I have

one exhibit that I will present to the Court. I have given a copy to defense counsel.

And let me start, Your Honor, by saying that the charges in this case against both these defendants are, in essence, the killing of a witness, a witness, a person who was to be a witness in a federal trial, that decedent being Leroy Copeland. And consequently, the background of the case relates to the Federal District Court in the District of Maryland in Greenbelt.

THE COURT: All right.

MR. MUELLER: And it starts with the involvement of these two Wilsons' older brother, whose name is James "Toe" Wilson, in the armed robbery of the Lanham-Seabrook Post Office back in October 1st, 1994. Now, three people were charged with involvement in that bank robbery: James "Toe" Wilson, and two other co-defendants, "Pee Wee" McDonald and Linda Thompson, sometime later. But between October 1st, 1994, the time of the bank robbery, and January 17th, 1996, when James "Toe" Wilson was indicted in District Court in Maryland, Leroy Copeland, the decedent in this case, who was then cooperating with the federal authorities, went into Lorton -- was in Lorton and tape-recorded a conversation with the older brother, James "Toe" Wilson, in which "Toe" Wilson made incriminating remarks with regard to his involvement in the Post Office robbery. And so at that time, Leroy Copeland obtained inculpatory evidence, information,

24

against "Toe" Wilson for that robbery.

On January 17th, 1996, James "Toe" Wilson was indicted in the Federal District Court in Greenbelt. He was indicted along with Linda Thompson and I believe "Pee Wee" McDonald, although "Pee Wee" McDonald later became a Government witness. That case proceeded from January, 1996 -- and that was before Judge Williams, Alexander Williams, in Greenbelt, and was being prosecuted by the U. S. Attorney's Office in Maryland. Between January 17th and March 19th, 1996, the case proceeded.

On March 19th, 1996, one week before the trial was supposed to start, Government counsel was under an obligation to produce Giglio material on its witnesses, and it sent at that time what I have marked as Government Exhibit No. 1, which I will hand to the Court, which is a letter from the Assistant United States Attorney handling that case to the attorneys for Mr. James Wilson, and the attorney for Wilson was Mr. Jacoby, and the co-defendant, the remaining co-defendant at that time, Linda Thompson. And you will see that there is, first of all, Giglio material relating to Anthony McDonald because he had pled and agreed to cooperate. And if the Court turns to page 2, the Court will see on page 2 of this letter the beginning of the Giglio material relating to Leroy Copeland. And that goes all the way to page 4.

What, in effect, this letter did was indicate at that time, just at that time, to Mr. Jacoby, "Toe" Wilson's counsel,

that Leroy Copeland was going to be a key witness in the trial. This letter is dated March 19th, 1996.

Now, on the following day, Mr. Jacoby met with Defendant Ralph Wilson and Mr. "Toe" Wilson, James Wilson's wife. At that time --

THE COURT: What is the lady's name?

MR. MUELLER: Maxine Wilson. Maxine Wilson is the wife of James Wilson, the one who is being prosecuted in Maryland.

THE COURT: Okay.

MR. MUELLER: But the attorney met with at that time Ralph Wilson and "Toe" Wilson's wife. And in the course of that meeting, he reviewed the substance of this letter that he had just received from the prosecutor, which, as I indicate -- which indicated that Leroy Copeland was going to be a principal witness in the trial.

Now, thereafter, on the -- and I will get back to tie this in, Your Honor, but just to finish off the chronology, on the 25th of March, Leroy Copeland, who had come up from Atlanta, where he was residing, and had met with the prosecutors that morning, was at the corner of 5th and N Streets, Northwest, which was one of his old haunts. And at that time, he was shot to death. There were 12 casings found at the scene. There were 13 gunshot wounds to his body. He was shot down at 7:49, I believe, approximately 7:49 that evening at the intersection of 5th and N Streets. As I said, there were 13 shots to his body,

12 shell casings found.  That was on the eve of the commencement of the trial against James Wilson in Maryland.

Now, let me turn to the evidence on each of these defendants.  Number one -- and perhaps I ought to start with Louis Wilson.  Now, what I would like to do at this time, Your Honor, is go through the four factors that are set out in the statute with regard to whether or not he should be detained. The first one is the nature and circumstances of the offense.

We believe, based on the testimony of a number of witnesses, that it is indeed -- which I will get to -- Louis Wilson who was the shooter.  The nature and circumstances of this offense go to the heart of the criminal justice system.  It is the killing of a critical witness, an important witness, on the eve of the trial.  There are far more -- excuse me.  Let me put it this way.  There are few more serious cases than the killing of a witness, particularly when it's juxtaposed to the fact that it is immediately after individuals learn that this person is going to be a witness and immediately preceding the time that that witness is to be called at trial.

Also under the nature and circumstances of the offenses, this was not a one shot, this was not a two shot, but this individual was shot 13 times.  Thirteen times.  Again, under the nature and circumstances of the offense, I think there is heavy weight that should go to the incarceration, continued detention of this Defendant.

Turning to the weight of the evidence again against Louis Wilson: First, the motive. There is a clear motive. By doing away with Leroy Copeland, Louis Wilson, Ralph Wilson and the other co-conspirator were expecting to enable James "Toe" Wilson to walk free, by killing the one principal witness that was still out on the streets and available.

I might, as an aside, say that Anthony McDonald at that time was incarcerated because he had pled guilty and was a cooperating defendant, and so was not really available to these defendants to eliminate. And so number one is motive.

With regard to Louis Wilson, at that time of evening, at the intersection of 5th and N, there were any number of witnesses. There are four witnesses who have positively identified the shooter as Louis Wilson and picked his photograph from photo spreads -- from a photo spread, I should say.

There is one other factor that I probably should include, and that is, the Wilsons, Louis Wilson and Ralph Wilson resided at 30 New York Avenue, which is approximately four to five blocks away from the intersection of 5th and N Streets, where this murder occurred.

Now, with regard to the third factor, the history and characteristics of the person. On the search of the Wilsons' house at 30 New York Avenue on April 30th -- I'm sorry. April 17th, I believe it was. In the house there was found a quantity of heroin and two guns. Now, I should say that most of the

28

heroin, if not all of the heroin, was found in Ralph Wilson's room and the two guns were found in Ralph Wilson's room. But it is a house that is lived in by both Louis Wilson and Ralph Wilson, it being a house that the brothers had inherited from their parents. I will say with regard specifically to Louis Wilson's room, there was found a rifle scope and some ammunition.

The fourth factor with regard to Louis Wilson is the nature and seriousness of danger to persons or community. I think actually the nature and circumstances of this offense speak also to this fourth factor. These two individuals before the Court were willing to shoot down in front of several witnesses a person who was to be a witness in a federal proceeding, which shows absolutely no faith, no trust in the criminal justice system and a total disregard to the -- I would say the necessity of assuring that the criminal justice system proceeds, but it is the ultimate in obstruction of justice, killing a witness who is about to testify in a federal case. And consequently, there is a continuous seriousness, a danger to, I would say the community, but more particularly, witnesses who may be willing to testify against these individuals. They have been willing to kill a witness before. That has a tremendously -- that is a threat to anybody else who would testify against them. And consequently, as to the fourth factor, I think it is demonstrated that there is danger to

29

specific persons, but also the community.

That was with regard to Louis Wilson. Now, going to Ralph Wilson, I have a copy of Judge Sporkin's order which I'll pass to the Court with regard to his detention.

THE COURT: All right.

MR. MUELLER: And counsel has a copy.

I would say, Your Honor, that with regard to Ralph Wilson, of the four factors that one looks to in determining whether detention is appropriate, the first one being the nature and seriousness of the offense, it's the same argument I would make as to Louis Wilson. This is an individual who was a witness, it's killing a witness. The witness was shot 13 times. We do not maintain that Ralph Wilson was the shooter. Rather, it was Louis. But there is a witness who will testify that Ralph Wilson, shortly -- not shortly before, but before Copeland was killed on Monday, the 25th, asked this individual to locate Copeland because Copeland was going to be a witness against Ralph Wilson's brother.

So, with regard to Ralph Wilson, you have not only motive, you have Ralph Wilson being the conduit of the information with regard to Copeland, since he was the one who met with the attorney and received the information that Copeland was going to be a principal witness, and you have Ralph Wilson asking at least one individual to help find Leroy Copeland because he was going to be -- Leroy Copeland was going to be a

witness against his brother.

And you have, finally, both Louis Wilson -- well, Louis Wilson and Ralph Wilson residing together at 30 New York Avenue during this full period of time.

I have spoken to the weight of the evidence with regard to him. Let me go on to the history and characteristics of Mr. Ralph Wilson. In 1982, as is I think recounted in Judge Sporkin's opinion, Mr. Ralph Wilson was convicted of robbery; in 1985, possession of cocaine; in 1988, possession with intent to distribute cocaine; and also in 1988, assault with a deadly weapon. And as I indicated previously with regard to the search of the house, two guns and a quantity of ammunition were found in Ralph Wilson's bedroom, a quantity of cash, as well as a quantity of heroin. And I think that perhaps speaks volumes as to the history and characteristics of Ralph Wilson.

Finally, Your Honor, with regard to the nature and seriousness of danger to the person or community with regard to Ralph Wilson, I would make the same argument I made before with regard to Louis Wilson: That individuals who are willing to murder a witness in another case are certainly capable of threatening and murdering witnesses who would testify against them.

And with that, Your Honor, I submit that both defendants should be detained, Louis Wilson be detained and Ralph Wilson, even though he is already detained on the other

31

case, detained on this case.

I might also add, Your Honor, by way of proffer, that Louis Wilson was arrested originally at Superior Court and has been detained upon a finding of the magistrate there that detention was appropriate.

THE COURT:  All right.  Thank you.

MR. MUELLER:  Thank you, Your Honor.

THE COURT:  Mr. Howard, if you would come forward with your client now.

MR. HOWARD:  Yes, Your Honor.

THE COURT:  You are Mr. Ralph Wilson.

DEFENDANT R. WILSON:  Yes, ma'am.

THE COURT:  Now, Mr. Wilson, you have heard the proffer that has been made with respect to you in this case, and I have it all of record.  And if it becomes necessary for me to make a judgment with respect to this case, I will.  But at the present time, what I think I understand Mr. Howard to be saying is that, since you are being held without bond in another case, he would have no objection to your being held here until such time as he deems it necessary to ask for me to consider it on its merits. Is that what I understand you to be saying?

MR. HOWARD:  That's correct, Your Honor.

THE COURT:  All right.  Then I will hold you without bond here without making a decision as to why I think you should be held without bond in this case.  But I will just hold you

32

without bond in this case.  And if something should happen in your other cases and you wish me to reconsider it, I will have the record and I will hear argument from him, and then we would make a judgment on it.  All right?

DEFENDANT R. WILSON:  Yes, ma'am.

THE COURT:  So right now, I just hold him without bond pending the next hearing.

MR. HOWARD:  Okay.  Thank you, Your Honor.

THE COURT:  What date did I give you?

MR. HOWARD:  The 24th.

THE COURT:  The 24th.  All right.

MR. HOWARD:  Your Honor, since we are going to be relying on the proffer that was made today, there is one question that I wasn't sure whether the implication was that the guns found in Mr. Ralph Wilson's room were traced back to the bullets in Mr. Copeland's body.  I'm not certain.

THE COURT:  No, I didn't hear that.

MR. MUELLER:  No.  And I should put on the record, Your Honor, that they were not traced back.

THE COURT:  Yes.  I did not hear that.

MR. MUELLER:  That's fair.

MR. HOWARD:  Thank you, Your Honor.

THE COURT:  All right.  You may step back with the Marshal now, Mr. Wilson, and I'll see you on the 24th.

(Defendant Ralph Wilson taken from the courtroom)

33

THE COURT:  Now I'm ready to proceed with respect to Mr. Louis Wilson, and I'll be happy to hear from you, Mr. Birdsong.

MR. BIRDSONG:  Thank you, Your Honor.

May it please the Court, Your Honor.  We've had a chance to hear this proffer.  Although I knew something about this case, we decided not to put on any evidence at this time.

THE COURT:  All right.

MR. BIRDSONG:  I would like to argue.  A proffer, in our opinion, Your Honor, is not as strong as putting witnesses on.  We've heard a number of things.  Of course, I have to agree with the Court that the killing of a witness to a federal case is one of the most heinous things that can happen in our criminal justice system.  However, I think this Court would be better served if this weight of the evidence that Mr. Mueller talks about, the witnesses who have identified them or at least the photographs that they were shown or something like that was given to the Court or presented to the Court through a witness.  Now, obviously, I'm hearing this for the first time.

THE COURT:  Yes.

MR. BIRDSONG:  And the Assistant U. S. Attorney is an officer of the court.  There are problems with I.D. sometimes.  We also know, Your Honor, that in my brief investigation of this matter, Mr. Copeland was sort of a professional snitch, who was getting quite a bit of money from various Government agencies.

34

And from what little I've learned, there were a number of people out to get him. So I think perhaps that needs to be taken into account.

Because a rifle scope and some ammunition may have been found in his room I think should be given very little weight. Probably every member of the National Rifle Association would be in a lot of trouble if that were a criteria for keeping him locked up.

But we come down, Your Honor, to the fact -- or one of the last facts. Mr. Wilson has been held now for almost six months in the D. C. Superior Court system without bail and without an indictment. Now, again, there's talk that he is a danger to the community because of this sort of thing. We think that when you look at the history and characteristics of the person and put aside some of the heinousness of this crime -- and I agree, based on what I've heard, a person shot 13 times who is a witness, or to be a witness in a federal trial, is an awful thing. But, again, we have a man here who is 38 years old, Your Honor. He's never been convicted of a crime. And for the last almost six months, he's been incapacitated because he's been sitting in the D. C. Jail, as I understand it.

We submit he is not or would not be a danger to the community. He has worked. He's lived in this city. He's a lifelong resident. He has two children, a 17-year-old son and an 11-year-old son. His former wife was here today. She works

35

for the ATF.  His sister-in-law where he lives was here.  And his sister were all in court.  Now, because of their work situation, they could not come back.  They did not expect this to be set for this afternoon.

And as we understand it, Your Honor, he has another charge hanging over his head in Superior Court which stems from this, but I'm led to understand that it's going to be dismissed on Monday, so he's not going to have that; he's just going to have these charges in this case.

We submit, Your Honor, that when you look at the factors, when you weigh them against the other characteristics and the fact that this is only a proffer and we haven't seen the evidence, we haven't seen supposedly these photo arrays from which the I.D.'s were made, we would say that this Court should give little weight to that.  We think you should err on the side of the Bail Reform Act and on the side of the statute, to give him release under conditions, Your Honor.  That's what we'd ask.

THE COURT:  All right.  Thank you very much, sir.

Mr. Mueller, certainly you have the last word here.

MR. MUELLER:  I only have one thing to add, Your Honor, and that is -- and perhaps I should have started with this -- we're here on an indictment.  The grand jury has reviewed this evidence and made the probable cause determination that this Defendant here is the person who is responsible for shooting Mr.

36

Copeland on that evening.

THE COURT:  All right.  If you would come forward now, Mr. Wilson, with your counsel.

Mr. Wilson, I have heard the proffer today of both you and your counsel -- you through your counsel and your counsel with respect to what type of bond, if any, should be set in this case.  Of course, there must be a bond in this case, because a grand jury has indeed indicted you on some very serious charges.  And I would suggest to you that the most serious charge on which you stand indicted is this first degree murder while armed, and it was charged that it was premeditated murder.

The burden is on the United States to demonstrate that it believes that you present a danger to the community or a danger of flight.  Mr. Wilson, I have been told by Mr. Birdsong that this is your home, that you live in a home that your parents provided for you, that you have lived here all your life.  I know from Pretrial Services that you have been employed and you have been employed at a very reputable institution, the Gallaudet College.  And all of those things are positives and do indeed speak to whether or not you should or could be released.

However, I know at least 17, maybe as many as 23 people, all citizens of the District of Columbia, have heard the evidence, or some of the evidence that the Government would present in this case, and those people, the grand jurors who

37

presented this indictment to us, have determined that there is probable cause to believe each and every count of this indictment, and one count of that indictment is that you committed first degree premeditated murder.  I don't know of any charge, drug charges notwithstanding, kilos notwithstanding -- I don't know of any charge that is more dangerous to the community than that of premeditated murder.  And I think that based on the charges and the circumstances which the grand jury heard and that they believe establishes probable cause, that you do indeed represent a danger to the community; and you even represent, in my view, a danger of flight.  And it is for that reason that I believe that I must hold you without bond pending a determination by a jury in this case with respect to the charges in this indictment.

So, the Court holds you without bond.  And this is, of course, something that is always open to further consideration.  But based upon what I know today, I would say that I must hold you without bond pending your trial in this case.  And presently, I will see you again next month for a status hearing.

Did I give everyone status hearing forms?  Let me give counsel status hearing forms, please.  And as I have indicated, what is important here is not so much that you use the form I give you, but just please give me the information.

MR. BIRDSONG:  Very well.

38

THE COURT: And I think I ask for it about two days before the hearing. That gives me some sense of what is going on. Okay?

MR. BIRDSONG: Your Honor, I take it you will entertain our request for reconsideration in writing in this matter with respect to bond?

THE COURT: Oh, most assuredly. Most assuredly.

MR. BIRDSONG: Thank you, Your Honor.

THE COURT: And I hope you will give me until -- as I told you, I'll be away next week. But if you really need it, I've put almost everything I had to say on the record. You could just order the record. Okay?

MR. BIRDSONG: Very well.

THE COURT: Is that agreeable with you, too?

MR. MUELLER: That's agreeable with me, Your Honor. Thank you.

THE COURT: Is that agreeable with you, Mr. Howard? I said if anybody needs anything that has been said in this case by me, it's on the record.

MR. HOWARD: Okay.

THE COURT: Because I'm not going to have time to do a written order before I leave. Okay?

MR. BIRDSONG: It's understood. That's fine, Your Honor.

THE COURT: You may step back with the Marshal at this

39

time, Mr. Wilson, and I'll see you on my return.

(Defendant Louis Wilson taken from the courtroom)

THE COURT:  Thank you very much, counsel.  And may I have this copy or --

MR. MUELLER:  Yes.  That is your copy, Your Honor.

THE COURT:  I can have that copy?  All right.  This copy that I'm asking for, Mr. Howard --

MR. HOWARD:  Yes, Your Honor.

THE COURT:  -- is the copy of an opinion entered on July 24th, 1996, by Judge Sporkin.  Okay?

MR. HOWARD:  Certainly.

THE COURT:  Thank you.  And that relates to your client; is that correct?

MR. HOWARD:  Yes.

THE COURT:  When is this case set for trial?

MR. HOWARD:  The Sporkin case?

THE COURT:  Yes.

MR. MUELLER:  I don't believe it is set at this time, Your Honor.

THE COURT:  All right.

MR. HOWARD:  Thank you, Your Honor.

THE COURT:  Thanks to all of you.

(Proceedings concluded at 4:10 p.m.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcription from the record of proceedings in the above-entitled matter.

_____
Official Court Reporter